**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HASELECT MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL, SP and GRIFFIN ASSET MANAGEMENT, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 22-cv-4269 |
| v. | ) ) | Judge Blakey |
| SIMON HENRY CLARK, an Individual | ) ) ) | Magistrate Judge Fuentes |
| Defendant. | ) ) | |
| SIMON HENRY CLARK, | ) ) ) | |
| Counter-Plaintiff and Third-Party Plaintiff, | ) ) ) ) | |
| v. | ) ) | |
| GRIFFIN ASSET MANAGEMENT, LLC, | ) ) | |
| Counter-Defendant, | ) ) ) | |
| and | ) ) | |
| MICHAEL GRIFFIN, DEBORAH GRIFFIN | ) ) ) ) | |
| Third-Party Defendants. | ) | |

**SIMON HENRY CLARK'S**
**COUNTERCLAIM AND THIRD-PARTY COMPLAINT**

NOW COMES Counter-Plaintiff/Third-Party Plaintiff, SIMON HENRY CLARK ("Clark"), by and through his attorneys, SWANSON, MARTIN & BELL, LLP, and for his Counterclaim and Third-Party Complaint against GRIFFIN ASSET MANAGEMENT, LLC

1

("GAM"), MICHAEL GRIFFIN ("Michael Griffin") and DEBORAH GRIFFIN ("Debbie Griffin"), and states as follows:

## INTRODUCTION

1.     For almost a decade, Michael Griffin misled and lied. Michael Griffin first misled his business partners as they helped him build the eponymously named Griffin Asset Management. Then, after his business partners, including Simon Clark, left GAM, he began lying to his investors. The house of cards fell, and now all of the funds set up by GAM are shuttered, with rumors of SEC investigations swirling around them.

2.     In his efforts to avoid the inevitable, Michael Griffin breached his fiduciary duty to Simon Clark. In an effort to keep money coming in so he could pay himself fees on gains that his funds never actually realized, Michael Griffin used Clark's name on his ADV filings to help solicit new investors. Meanwhile, GAM and Debbie Griffin defamed Clark in an effort to ruin his reputation.  As a result, Clark has incurred considerable reputational and monetary damages.

## THE PARTIES

3.     Simon Clark has spent the last forty years developing a well-earned reputation as an honest and reliable international wealth manager. Clark has managed wealth in the United States, Europe, Asia, and South America, and held leadership positions with S.G. Warburg, Deutsche Bank, and Bank of America. Starting in the 1980s, Clark assisted with the transition of English Merchant bank into an industry leading investment firm known as Mercury Securities. That same decade, he assisted S.G. Warburg in its merger with Deutsche Bank to create a global financial institution. In the 1990s, Clark worked with the NationsBank acquisition team, which led to work involving the purchase of Montgomery Securities in 1997 and Bank of America in 1998. With the Bank of America acquisition, he moved to the west coast where he built out wealth

management and private banking capabilities for the burgeoning IBank.

4.      From 2002 to 2007 he ran Private Bank and Wealth Management Group for First Republic Bank prior to its acquisition by Merrill Lynch. In 2007 Lloyds Bank recruited him to oversee the merger of that company's Private Bank with the Bank of Scotland, thereby creating a $27 billion investment, trust, and credit wealth management group. Clark is a resident of the state of North Carolina.

5.      GAM is an Illinois Limited Liability Company with its principal place of business in La Grange, Illinois. GAM manages numerous hedge funds which are subsidiaries of GAM and for which GAM receives a performance fee. Of the ten known funds managed by GAM, all ten are closed or currently in bankruptcy.

6.      Michael Griffin, upon information and belief, is an individual and a citizen of the state of Illinois. Griffin is the sole manager of GAM.

7.      Debbie Griffin, upon information and belief, is an individual and a resident of the state of Illinois.

**JURISDICTION**

8.      This Court has ancillary jurisdiction herein pursuant to 28 U.S.C. § 1367.

**FACTS RELEVANT TO ALL COUNTS**

**Clark joins GAM**

9.      On December 16, 2016, Meyer, as President of GCM, offered Clark a position to join the senior leadership team at HedgeACT Select, LLC ("HedgeACT"). (Exhibit 1).

10.      As compensation for accepting the December 16, 2016 offer, Clark was to be compensated with equity and cash compensation. This compensation was associated with the performance of HedgeACT and HASelect-FTM Medical Receivables Litigation Finance Fund

International, SP ("HASelect"). (Exhibit 1).

11.    Clark's role included the development of an international fund, which became HASelect.

12.    Clark's responsibilities included "utiliz[ing his] talents, experience, and network to pursue all aspects of increasing assets: direct selling, hiring and managing sales associates, recruiting fund managers, and developing strategic partnerships . . . .". (Exhibit 1).

13.    Clark accepted this offer and began working with HASelect as an independent contractor in 2017.

14.    Clark performed all of his responsibilities under the terms of the independent contractor agreement.

**Clark Develops Investors for HASelect**

15.    Chadwick Meyer a member of GAM and of its senior leadership, (Exhibit 2), had a prior relationship with Will Martin ("Martin"), who operated Altos Investments and subleased space from Three Bell Capital ("Three Bell").

16.    When Clark began working for HedgeACT, he was in charge of handling the relationship with HASelect and Three Bell and got to know Martin

17.    In or around March 2017, Clark met with Martin, who stated that he was able to work with HASelect, but that John Porter ("Porter") of Three Bell had another relationship at that time.

18.    As Will Martin became more involved with Three Bell, Clark was able to communicate more frequently with Porter and Eric Patterson of Three Bell, and ultimately became friends with them.

19.    Over time, Clark built trust, a relationship, and a friendship with Martin and Porter,

4

and ultimately was able to build an asset base for GAM when Martin became interested in setting up a medical fund with HASelect.

20.     Three Bell's fund structure with HASelect included a fund and a fund of funds. The fund of funds charged a platform fee and a management fee, causing Three Bell to be charged at both the fund level and the fund of fund level.

**HASelect, FTM and Infinity Enter into a Relationship**

21.     Prior to entering into any agreement with Infinity or FTM, Michael Griffin, Chadwick Meyer, James Gallagher, and Clark met with representatives of Infinity and FTM in Las Vegas, Nevada on or about November 18, 2018.

22.     The following day, Michael Griffin, Chad Meyer, James Gallagher, and Clark met with Infinity at Infinity's operations in Henderson, Nevada. Clark's responsibility was to learn the sales and collections process for Infinity, while James Gallagher conducted due diligence, and Chad Meyer and Michael Griffin met with Oliver Hemmers, Anne Pantelas, and representatives of FTM.

23.     Following the meeting with Infinity, GAM, through its HASelect entity, decided to enter into relationships with Infinity and FTM.

24.     The basic business relationship between HASelect, Infinity and FTM was that Infinity would locate opportunities to provide financing to individuals with medical malpractice claims, then provide litigation financing to those individuals. Infinity would also determine the value of the receivables on the litigation finance deals.

25.     FTM, as a sub-advisor, was responsible for verifying all of the paperwork and confirming the value of receivables on the litigation finance deals made by Infinity.

26.     Only after FTM confirmed the value of the receivables would HASelect consider

lending money to Infinity with the medical receivables as collateral.

27.     Once FTM confirmed the value of the receivables, the information was provided to GAM/HASelect, who had discretion to provide funding or not.

28.     Debbie Griffin, Michael Griffin's wife, has considerable experience as a forensic accountant.

29.     Debbie Griffin was the GAM employee responsible for approving or disapproving the distribution of funds to Infinity.

30.     In exchange for providing the funding, HASelect received interest on its loans and held the medical receivables as collateral.

31.     Clark memorialized the relationship between HASelect and Infinity in the MLA.

32.     The business relationship between HedgeAct and FTM was separately memorialized in the Sub-Advisory Agreement ("SAA").

**GAM Controlled HASelect At All Times**

33.     GAM received management fees from its investment funds, which included investments managed by HASelect, while a separate entity, Griffin Capital Management, LLC ("GCM") collected performance fees.

34.     GCM was the managing member of HedgeACT.

35.     Griffin was the CEO of GAM, GCM, HASelect, HedgeACT and other similarly situated subsidiaries.

36.     Debbie Griffin handled all accounting and administrative tasks relative to GAM, GCM, HASelect, and HedgeACT, such as handling the day-to-day paperwork with clients, managing money flow in and out of the companies, controlling all documents, and managing all bank accounts.

6

**Clark Becomes a Member of GAM**

37.    Clark performed under the terms of the 2016 Agreement, but only after considerable delay did Michael Griffin and GAM partially fulfill its obligations to Clark by providing some of the promised equity interest in GAM and GCM to Clark in 2019. (Exhibit 2).

38.    Under the terms of the Operating Agreement executed by Clark and Michael Griffin, Clark obtained Class B and Class C Interests in GAM and GCM, and continues to retain Economic Interests in the same. (Exhibit 2).

39.    Pursuant to the Operating Agreement, GAM is a manager-managed LLC and Michael Griffin is the sole Manager. (Exhibit 2, VII.1).

40.    As Manager of GAM, Michael Griffin was to "refrain[] from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of the law which results or shall have resulted in material loss or injury to the Property or operations of the Company." (Exhibit 2, VIII.1).

**Michael Griffin's Reckless Mismanagement Causes Clark's Departure**

*Madison Square Partners*

41.    In or around September 2018, Michael Griffin began developing a relationship with Chris Erwin ("Erwin"), an attorney in California.

42.    At that time, Erwin was in charge of finding policies for life settlement funds with Laureola Advisors ("Laureola"), which was owned and run by Tony Bremness.

43.    Laureola was a competitor of Madison Square Partners ("MSP") in London, but operated in different market spaces. MSP tended to buy policies ranging between $2,000,000 to $5,000,000, while Laureola would buy smaller policies, but which had a greater likelihood of morbidity.

44.     In light of this relationship with Erwin, Laureola was added to HedgeACT's Morpheus life fund, which was opened in January 2018.

45.     Once Michael Griffin and Erwin became friends, it became clear that Erwin was frustrated that Laureola was proud of not marking up the value of accounts by taking fees on projected gains and instead waiting for any gains to be realized.

46.     Ultimately, Erwin split off from Laureola, and began acting as a purchaser of receivables on behalf of HedgeACT.

47.     Unlike Laureola, the policies purchased by Erwin on behalf of HedgeACT would be marked up to an estimated value, and then HedgeACT would collect performance fees based on the estimated value of the policies, not on any actual, realized value.

48.     As a result of HedgeACT's accounting practices with Erwin, MSP refused to participate further and stopped providing HedgeACT with funds.

49.     Because the mark-up on the policies was greater than the actual value of the funds, HedgeACT is now unable to sell the policies for their marked-up values, and the fund had to be gated[1] and is currently in wind-down mode.

50.     Concurrently, MSP had set up the Waterford fund with HedgeACT. However, in light of Michael Griffin's new found friendship with Erwin, Michael Griffin began diverting funds to Erwin instead of the Waterford fund.

---

1 A gate provision refers to a statement in a fund's offering documents that establishes the fund manager's right to limit or halt redemptions. The prospectus or offering documents may provide more detail on a gate provision, such as scenarios where redemptions would be restricted or halted entirely.

Gate provisions are intended to stop a run on a fund, particularly when the assets a fund holds are illiquid and difficult to turn to cash for redemption in a timely manner. Even with scenarios and guidelines, the decision to exercise the gate provision is the fund managers. Gate Provision: What it is, How it Works, Example (investopedia.com)

51. On or around October 31, 2019, Clark and Michael Griffin met with members of MSP.

52. Michael Griffin had failed to provide MSP with a number of documents, including balance sheets.

53. Griffin's actions ultimately lead to the relationship with MSP deteriorating.

54. Erwin was later suspended by the State Bar of California.

*Three Bell Capital*

55. Three Bell provided a significant source of funds allowing HASelect and the other entities operated by GAM and GCM to make investments.

56. Michael Griffin began to undermine the relationship with Three Bell Capital, and declared the Three Bell account an in-house account, depriving Clark of additional equity in GAM.

57. Further, on or about January 28, 2020, Three Bell approached Griffin to discuss putting the associated fees in line with the market rates.

58. Three Bell was the primary source of assets for HedgeAct and yet Griffin insisted on charging Three Bell fees in excess of market standards.

59. In fact, without notifying Clark, who was responsible for the Three Bell relationship, Michael Griffin had unilaterally increased the performance fees several times. Further straining the relationship with Three Bell.

60. Michael Griffin also threatened Three Bell that he would take all of their assets if he desired.

61. This grossly negligent management of the relationship led to the deterioration of the relationship with Three Bell, a major client of GAM.

**Clark Leaves**

62.     Michael Griffin's intentional misrepresentations to the clients and the deterioration of these business relationships due to Michael Griffin's actions caused Clark to be damaged financially and by reputation.

63.     Because of Michael Griffin's intentional damage to these business relationships, Clark lost his earning capacity as a member of GAM and President of HASelect.

64.     As such, Clark was left with no other option but to resign from his position and did so on February 20, 2020.

65.     Further, in or around March 2020, Clark was made aware that Michael Griffin and Debbie Griffin, as a representative of GAM, had spread misinformation about Clark's reasons and circumstances for departing to third parties.

**Debbie Griffin Fails to Vet Investments With Infinity**

66.     Pursuant to the terms of the agreement with Infinity, HASelect had to discretion on all transactions with Infinity.

67.     At HASelect, Debbie Griffin was responsible for vetting all potential investments with Infinity.

68.     Infinity used a Sharefile system to provide Debbie Griffin with information about potential investments and she approved the investments. The information was not made available to Clark.

69.     Despite Debbie Griffin's experience as a forensic accountant, Debbie Griffin failed to notice that Infinity was borrowing more funds than they were using to purchase receivables.

70.     Despite the fact that Infinity became indebted to HASelect by as much as $8.4 million, with a 19% interest rate and 6% performance fee, she continued to lend money to Infinity.

71.     Debbie Griffin continued to lend money despite the fact that she knew Infinity had lost their own auditors.

72.     When it became clear that Infinity was unlikely to pay these debts, and despite knowing that there was considerable uncertainty regarding whether or not Infinity might ever repay the debts, Griffin misled investors by reporting to investors that there "zero probability" of default with the Infinity investments in the 2020 audit of the funds.

73.     Michael Griffin knew that there was considerable risk with the Infinity investments, and initiated litigation proceedings against Infinity for failure to pay its debts.

74.     In fact, while he was telling investors there was "zero probability" of default with Infinity investments, Griffin was preparing legal action against Infinity to collect unpaid sums, and was aware that any recovery would likely require significant write-offs of "gains" previously calculated by the funds.

75.     Michael Griffin sued Infinity.

76.     Griffin, through his counsel, then offered to settle his litigation with Infinity in exchange for favorable testimony from Oliver Hemmers of Infinity in this matter.

77.     Mr. Hemmers refused Michael Griffin's offer because it would require him to lie.

78.     Specifically, Griffin made this request because he knew that his wife, Debbie Griffin, and not Clark, was responsible for failing to conduct proper due diligence of the investments with Infinity, despite stating in litigation and elsewhere that this was Clark's responsibility.

**GAM Files ADVs Filed with Falsehoods**

79.     According to ADV filings filed by GAM on or about October 25, 2021 and March 11, 2022 Michael Griffin and related persons' withdrew $1.2 million from the HASelect-Waterfod

International Fund. When investors inquired about this, GAM's in-house counsel and director of compliance stated that this was a mistake in the ADV and that the Griffins' do not have an ownership in these funds.

80.     Despite the statements that Michael Griffin did not have an interest in the funds, and thus there were not any redemptions by the Griffins, the ADV reported in at least March 2020, June 2021, and October 2021 that approximately 54% of the fund was beneficially owned by Michael Griffin or related persons.

81.     Further, GAM and Michael Griffin uses these ADVs as part of their pitch for additional investors.

82.     Despite the fact that Clark left GAM and HASelect, Michael Griffin and GAM continued to represent that Simon Clark was associated with GAM by using his name on their ADV.

83.     Clark made multiple inquiries requesting that GAM remove Clark from its ADVs, and ultimately GAM removed Clark's name from the ADVs.

84.     Upon information and belief, despite knowing that Infinity was not making payments on its debts, Michael Griffin and GAM continued to book performance and management fees on the accrued, but unpaid interest from Infinity.

85.     Griffin and GAM then paid themselves by using money coming from new investors who were solicited in part by using Clark's good name and reputation.

## COUNT I
## BREACH OF FIDUCIARY DUTY
### (AGAINST MICHAEL GRIFFIN)

86.     Clark repeats and realleges Paragraphs 1-85 as Paragraph 86 of Count I.

87.     Michael Griffin, as the sole Manager of GAM and pursuant to the GAM Operating

Agreement, owed Clark a fiduciary duty of loyalty, care, and good faith to refrain from engaging in gross negligence or reckless conduct, intentional misconduct, or a knowing violation of the law.

88.     Michael Griffin nevertheless breached these duties by his careless and intentional misconduct in one or more of the following ways:

   a.   Intentionally and fraudulently misstating the earnings of client investments so as to charge fraudulent performance fees on loans and to induce additional investors;

   b.   Intentionally mishandling relationships with FTM, Three Bell, and MSP, leading to diminished earnings of Clark;

   c.   Engaging in otherwise grossly negligent conduct, intentional misconduct, or knowing violation of the law.

89.     The misconduct of Michael Griffin misled investors and was fraudulent and intentional in nature, or at least with such gross negligence as to indicate a wanton disregard for the rights of Clark.

90.     As a direct and proximate result of Griffin's breach of his fiduciary duties, Clark has suffered significant damages to his earning capacity as a member of GAM or was otherwise damaged.

## COUNT II
## RIGHT OF PUBLICITY
### (AGAINST DEFENDANT GRIFFIN ASSET MANAGEMENT)

91.     Clark repeats and realleges Paragraphs 1-85 as Paragraph 91 of Count II.

92.     Clark did not provide Griffin or GAM written consent to use his name on any ADV after his departure from GAM and HASelect.

93.     Griffin and GAM use their ADV as part of materials provided to prospective investors to solicit investments.

94.     Griffin and GAM held out Simon Clark as a part of GAM by including his name

on the ADV without Clark's authorization for purposes of soliciting customers.

95.     Clark notified Griffin and GAM that they were misusing his name, yet Griffin and GAM continued to willfully list Clark on their ADV in efforts to solicit customers.

96.     Clark is a living person.

97.     As a direct and proximate result of Griffin and GAM's violation of Clark's Right of Publicity, Clark has incurred actual damages, and Griffin and GAM have derived profits from its misuse.

**COUNT III**
**TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY**
**(AGAINST GRIFFIN ASSET MANAGEMENT AND MICHAEL GRIFFIN)**

98.     Clark repeats and realleges Paragraphs 1-95 as Paragraph 98 of Count III.

99.     Upon information and belief, Three Bell was the largest contributor of assets to HASelect.

100.    Clark had a reasonable expectancy of continued business with Three Bell.

101.    By intentionally and fraudulently mishandling the relationship and assets of Three Bell, GAM and Michael Griffin purposely and intentionally interfered with Clark's business expectancy by attempting to destroy Clark's reputation and business relationship with Three Bell.

102.    Not only did GAM and Michael Griffin interfere with this relationship as set out above, upon information and belief, GAM and Griffin classified Three Bell as a house account so that Clark would not be owed an additional 2% fee.

103.    The misconduct of GAM and Michael Griffin was fraudulent and intentional in nature, or at least with such gross negligence as to indicate a wanton disregard for the rights of Clark.

104.    As a result of GAM and Michael Griffin's actions, Clark has suffered economic

damages through the loss of a continued business relationship with Three Bell, as well as damage to his personal professional reputation.

## COUNT IV
## BUSINESS DEFAMATION
### (AGAINST DEFENDANT GRIFFIN ASSET MANAGEMENT)

105.    Clark repeats and realleges Paragraphs 1-104 as Paragraph 104 of Count IV.

106.    GAM and Griffin have knowingly made several negative, misleading, and false misrepresentations regarding Clark's character and circumstances surrounding his departure from HedgeACT to numerous third parties.

107.    GAM and Griffin knew or should have known that their statements would injure Clark's reputation, business, and standing within the industry.

108.    The misconduct of GAM and Griffin was fraudulent and intentional in nature, or at least with such gross negligence as to indicate a wanton disregard for the rights of Clark.

109.    GAM and Griffin's misrepresentations have injured Clark and caused him damages in an amount to be proven at trial.

## COUNT V
## Breach of Fiduciary Duty
### (AGAINST DEFENDANT DEBORAH GRIFFIN)

110.    Clark repeats and realleges Paragraphs 1-85 as Paragraph 110 of Count V.

111.    Michael Griffin, assigned his wife, Deborah Griffin, the key managerial responsibility of overseeing the relationship with Infinity, including the financial audit of their accounts and requests for additional money.

112.    Deborah Griffin coordinated exclusively with Infinity such that Infinity sent financial paperwork directly to her and Clark did not have access to Infinity's records or financial requests.

113.     After failing to determine that Infinity was not using the proceeds from GAM for distributions to potential recipients, Deborah Griffin assisted Michael Griffin in collecting fees on unrealized returns.

114.     Deborah Griffin is experienced in forensic accounting and owed a duty of loyalty, care, and good faith to refrain from engaging in gross negligence or reckless conduct, intentional misconduct, or a knowing violation of the law.

115.     Deborah Griffin nevertheless breached these duties by her careless and intentional misconduct in one or more of the following ways:

> d.  Intentionally and fraudulently misstating the earnings of client investments so as to charge fraudulent performance fees on loans and to induce additional investors;
>
> e.  Carelessly and recklessly failing to investigate how Infinity used the funds she authorized;
>
> f.  Engaging in otherwise grossly negligent conduct, intentional misconduct, or knowing violation of the law.

116.     The misconduct of Deborah Griffin misled investors and was fraudulent and intentional in nature, or at least with such gross negligence as to indicate a wanton disregard for the rights of Clark.

117.     As a direct and proximate result of Deborah Griffin's breach of her fiduciary duties, Clark has suffered significant damages to his earning capacity as a member of GAM or was otherwise damaged.

WHEREFORE, Counter-Plaintiff/Third-Party Plaintiff, SIMON HENRY CLARK, respectfully requests this Court find in his favor and against Counter-Defendant, GRIFFIN ASSET MANAGEMENT, LLC, and Third-Party Defendant, MICHAEL GRIFFIN, and enter an order providing the following:

a.   Entering a judgment against MICHAEL GRIFFIN, individually, for compensatory damages arising from his breach of fiduciary duties to SIMON HENRY CLARK in an amount to be established at trial;

b.   Entering a judgment against GRIFFIN ASSET MANAGEMENT, LLC and MICHAEL GRIFFIN, individually, for actual damages, derived profits, and statutory damages arising from their violation of SIMON HENRY CLARK's right of publicity in an amount to be established at trial;

c.   Entering a judgment against GRIFFIN ASSET MANAGEMENT, LLC for punitive and compensatory damages arising from its defamation of SIMON HENRY CLARK in an amount to be established at trial;

d.   Awarding punitive and compensatory damages against DEBORAH GRIFFIN for her breach of fiduciary duty owed to SIMON HENRY CLARK in an amount to be established at trial;

e.   Awarding punitive damages against GRIFFIN ASSET MANAGEMENT, LLC and MICHAEL GRIFFIN, individually, to deter them and others from committing similar acts;

f.   Awarding SIMON HENRY CLARK the costs of this action, including but not limited to attorneys' fees, expert fees, and any other reasonable expenses incurred in the litigation as a result of the wrongful conduct of GRIFFIN ASSET MANAGEMENT, LLC and MICHAEL GRIFFIN, individually; and

g.   Awarding all other relief this Court deems just and proper.

### JURY DEMAND

Counter-Plaintiff/Third-Party Plaintiff, SIMON HENRY CLARK, demands trial by jury.

Respectfully submitted,

By:   _____
Counsel for Counter-Plaintiff/
Third-Party Plaintiff,
Simon Henry Clark

William D. Patterson
Troy M. Sphar - (ARDC: 6278497)
SWANSON, MARTIN & BELL, LLP

17

330 North Wabash Ave, Suite 3300
Chicago, Illinois 60611
wpatterson@smbtrials.com
tsphar@smbtrials.com
T: (312) 321-9100/F: (312) 321-0990

## VERIFICATION BY CERTIFICATION

Pursuant to 28 USC § 1746, the undersigned certifies under penalty of perjury that the foregoing is true and correct, except as to matters therein stated to be on information and belief, and to such matters the undersigned certifies that he verily believes the same to be true.

June 13, 2023

6/13/23

_____

Simon Clark

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing Counterclaim and Third-Party Complaint was served upon all counsel of record via the Court ECF system this 13th day of June, 2023.

[✓]  Under penalties as provided by law, the undersigned certifies that the statements set forth in this Certificate of Service are true and correct.

*/s/ Natalie Dombrowski*