# OPERATING AGREEMENT

## OF

## GRIFFIN ASSET MANAGEMENT, LLC

### as of January 1, 2019

60600643.8
60600643.12

# OPERATING AGREEMENT

## OF

## GRIFFIN ASSET MANAGEMENT, LLC
### (an Illinois limited liability company)

THIS OPERATING AGREEMENT (the "**Agreement**") is made and entered into as of ~~January 1, 2019,~~ by and among Griffin Asset Management, LLC, an Illinois limited liability company (the "**Company**"), the persons executing this Agreement as a "member" as set forth on Schedule A attached hereto, and such other persons who from time to time become "members" by joining this Agreement (each a "**Member**"), and such other persons who are otherwise bound or become bound by this Agreement as provided herein.

*[Handwritten marginal note: STET; October 31, 2019]*

## RECITALS:

A.      The Company was formed by the filing of the Articles of Organization with the Secretary of State of the State of Illinois under the Act in 2016;

B.      The Company and its sole Member believe it is best interest of the Company to admit additional Members to attract the best principals to grow and strengthen the business of the Company;

C.      In order to admit additional Members, this Agreement has been adopted and approved by the sole Manager and Member;

D.      The parties agree that the terms of this Agreement set forth the rules, regulations and provisions regarding the management and business of the Company, the governance of the Company, and the rights and privileges of its Members, except to the extent expressly prohibited or ineffective under the Act.

NOW THEREFORE, in consideration of the premises and the mutual agreements contained herein, the parties hereto agree as follows:

## ARTICLE I

### BUSINESS PURPOSES AND OFFICES

1.1 **Nature of Business Purpose**.  The Company may engage in any lawful business permitted by the Act or the laws of any jurisdiction in which the Company may do business. The Company shall have the authority to do all things necessary or convenient to accomplish its purpose and operate its business as described in the Articles.

1.2 **Principal Office**.  The principal business office of the Company will be located at 403 South LaGrange Road, LaGrange, IL 60525, or another place or places as the Manager may determine.

name of the resident agent of the Company in the State of Illinois will be as stated in the Articles, or as will be determined from time to time by the Manager and appropriately filed with the Secretary of State as required by the Act.

1.4 **Foreign Qualification**. The Company will register and qualify as a foreign limited liability company under the laws of such jurisdictions as may be determined by the Manager. The location of the registered office and the name of the resident agent of the Company in each foreign jurisdiction will be determined from time to time by the Manager and appropriately filed with the appropriate offices in such jurisdiction.

## ARTICLE II

### DEFINITIONS

II.1 **Terms Defined Herein**. Certain terms used in this Agreement are defined in the Tax Exhibit (defined below). As used herein, the following terms will have the following meanings, unless the context otherwise specifies:

"**Act**" means the Illinois Limited Liability Company Act, as amended from time to time.

"**Affiliate**" shall mean, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with that Person; for purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") shall mean the ownership or control of securities possessing more than fifty percent (50%) of the voting power of all outstanding voting securities of an entity or the power otherwise to direct or cause the direction of the management and policies of the entity, whether through the ownership of voting stock or similar rights.

"**Agreement**" means this Operating Agreement of the Company, as amended from time to time.

"**Allocations**" means any allocations among the Members and Assignees of Profit, Loss, Credits or items thereof.

"**Articles**" means the Articles of Organization of the Company filed with the Secretary of State of Illinois, as amended from time to time.

"**Assignee**" means a Person to whom all or part of a Member's Membership Interests or Economic Rights has been Transferred, but who has not been admitted as a Substitute Member with respect to such Transferred Membership Interests or Economic Rights.

"**Available Cash**" means the aggregate amount of cash on hand or in bank, money market or similar accounts of the Company at any given time derived from any source (other than Capital Contributions and Liquidation Proceeds) which the Manager determines is available for distribution to the Members and Assignees in accordance with the Act and any applicable loan covenants after all current debt service obligations of the Company are satisfied, Guaranteed Payments are made, and after taking into account any amount required or appropriate to maintain a reasonable amount of Reserves. The Manager shall allocate Available Cash between Available Cash generated from Domestic Operations and Available Cash generated from International Operations.

"**Award Agreement**" means any Class B Interest Award Agreement or Class C Interest Award Agreement between the Company and a Class B Member or Class C Member, as applicable.

"**Bankruptcy**" with respect to any Person, means the entry of an order for relief against such Person under the United States Bankruptcy Code, the insolvency of such Person under any state insolvency act or any other event of "bankruptcy" with respect to such Person as described in the Act.

"**Business**" means the business currently being conducted and proposed to be conducted by the Company, including providing financial advisory services to investors.

"**Capital Account**" means the separate bookkeeping account established and maintained for each Member and Assignee by the Company in accordance with Section 3.3 and the Tax Exhibit.

"**Capital Contribution**" with respect to a Member, means the total amount of cash and

the third person to properly contributed (or Member's assets or interest) to the capital of the Company.

"**Class A Interest**" shall mean a Membership Interest that is designated as a Class A Interest, as reflected on <u>Schedule A</u>. Class A Interests shall be entitled to one vote per Class A Interest.

"**Class A Member**" shall mean a Member holding a Class A Interest.

"**Class B Interest**" shall mean a Membership Interest that is designated as a Class B Interest, as reflected on <u>Schedule A</u>. Class B Interests shall be non-voting Membership Interests.

"**Class B Member**" shall mean a Member holding Class B Interests.

"**Class C Interest**" shall mean a Membership Interest that is designated as a Class C Interest, as reflected on <u>Schedule A</u>.

"**Class C Member**" shall mean a Member holding Class C Interests. Class C Interests shall be non-voting Membership Interests.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of future laws.

"**Dissociation**" shall mean any activity that causes a Person to cease to be a Member as described in <u>Section 10.6</u> (with correlative meanings for other forms of the word).

"**Distributions**" means any distributions by the Company to the Members and Assignees of Available Cash or Liquidation Proceeds.

"**Domestic Distribution Percentage**" shall mean with respect to a Member, such Member's Percentage Interest divided by the aggregate Percentage Interests of all Members entitled to a distribution of Available Cash from Domestic Operations or net assets attributable to Domestic Operations, as applicable.

"**Domestic Operations**" means the division of the Company that derives revenue from domestic investors investing in domestic funds advised by the Company.

"**Economic Rights**" has the meaning set forth in <u>Section 10.1</u>.

"**For Cause**" with respect to a termination of a Member's employment or engagement with the Company, means, (a) a Member's indictment of or conviction for (or pleading nolo contendere to) any felony in connection with the Business of Company or which the Company reasonably determines would likely negatively impact the Business of Company, or (b) action by the Member that constitutes willful malfeasance or gross negligence of his duties in connection with his activities on behalf of the Company, or (c) Member's commission of an act of theft, fraud, embezzlement, falsification of records, dishonesty or other similar serious and willful misconduct involving Company or its Business.

"**Guaranteed Payments**" has the meaning set forth in <u>Section 5.7</u>.

"**International Distribution Percentage**" shall mean with respect to a Member, such Member's Percentage Interest divided by the aggregate Percentage Interests of all Members entitled to a distribution of Available Cash from International Operations or net assets attributable to International Operations, as applicable.

"**International Operations**" means the division of the Company that derives revenue from offshore investors investing in offshore funds advised by the Company.

"**Involuntary Transfer**" means, with respect to Membership Interests and despite the Transfer restrictions set forth in this Agreement, that the Membership Interests (or a portion thereof) has been Transferred by operation of law (such as, without limitation, Transferred to a Member's trustee in Bankruptcy) or under levy of attachment or charging order or upon foreclosure of a pledge or security interest.

"**Liquidation Proceeds**" means all Property at the time of final liquidation of the Company and all proceeds thereof.

"**Majority in Interest**" means Class A Members holding an aggregate of more than 50% of the Class A Interests entitled to vote. Whenever this Agreement provides that a Majority in Interest is to be determined by excluding a certain Class A Member(s) or is to be determined

with respect to any certain Class A Members, then a majority in interest made among those excluded Class A Member or group of Class A Members holding an aggregate of more than 50% of the voting Membership Interests held by all of the non-excluded Members.

"**Manager**" refers to the Person serving as the manager of the Company, and any replacement manager, as determined under Section 7.1 below.

"**Members**" means those Persons executing this Agreement as "members" of the Company, or otherwise becoming bound by this Agreement as members of the Company as provided in this Agreement, in each such Person's capacity as a member of the Company, and includes a reference to Class A Members, Class B Members and Class C Members. The Members are set forth on Schedule A attached hereto. Schedule A will be updated from time to time by the Manager to reflect the then current Members of the Company.

"**Membership Interest**" means an equity interest in the Company entitling its holder to such rights and interests in, and obligations to, the Company in its capacity as a Member, all as provided in the Articles, this Agreement, an Award Agreement and the Act, and includes a reference to Class A Interests, Class B Interests and Class C Interests. "Membership Interest" does not include a Member's rights as a lender to or creditor of the Company, as an independent contractor of the Company, or in any other similar capacity.

"**Organization**" shall mean a Person other than a natural person, including, without limitation, corporations (both non-profit and other corporations), partnerships (both limited and general), joint ventures, limited liability companies, trusts and unincorporated associations.

"**Percentage Interest**" shall mean the Percentage Interests set forth on Schedule A opposite each of the Members' respective names, as may be updated from time to time upon a change in Percentage Interest of a Member.

"**Person**" means any natural person, Organization, estate, custodian, nominee or other individual or entity in its own or representative capacity.

"**Property**" means all properties and assets that the Company may own or otherwise have an interest in (to the extent of such interest) from time to time.

"**Reserves**" means amounts set aside from time to time by the Manager in accordance with Section 5.6.

"**Substitute Member**" has the meaning set forth in Section 10.3.

"**Tax Exhibit**" means the additional definitions and provisions relating to allocations of Profit, Loss, and other tax matters that are contained in Exhibit A.

"**Transfer**" or "**Transferred**" means (i) when used as a verb, to give, sell, exchange, assign, transfer, pledge, hypothecate, bequeath, devise or otherwise dispose of or encumber, and (ii) when used as a noun, the nouns corresponding to such verbs, in either case voluntarily or involuntarily, by operation of law or otherwise, including, without limitation, upon Bankruptcy, death, divorce, marriage dissolution or otherwise.

"**Treasury Regulations**" means the regulations promulgated by the Treasury Department with respect to the Code, as such regulations are amended from time to time, or corresponding provisions of future regulations.

"**Willful Misconduct**" shall mean any of the following acts or omissions:

(a)  any act or omission that constitutes fraud or a knowing violation of law which results in material loss or injury to the Property or operations of the Company;

(b)  theft or embezzlement of money or other Property of the Company; or

(c)  indictment or conviction of a felony, which results or is likely to result in loss or injury to the Property or operations of the Company.

**ARTICLE III**

**CAPITAL CONTRIBUTIONS; LOANS; ADDITIONAL CAPITAL CONTRIBUTIONS**

III.1  **Initial Capital Contributions**.  Michael E. Griffin has made Capital Contributions to the Company as set forth in the books and records of the Company in exchange for his Class

exchange for their respective Class B Interest and Class C Interest. The Class B Interest and Class C Interest granted to Chadwick Meyer and Simon Clark, respectively, are intended to be a profits interest within the meaning of Rev. Proc. 93-27, 1993-2 C. B. 343, and this Agreement shall be so construed. No amount shall be credited to the initial Capital Accounts of Chadwick Meyer and Simon Clark as a result of their contributions of services to the Company. The net agreed value of the Company as of December 31, 2018 is $100,000.00 (one hundred thousand dollars). The Capital Accounts of the Members as of the date of this Agreement are set forth on Schedule A attached hereto and made a part hereof.

III.2 **Additional Capital Contributions**

(a) The Members recognize that the Company may require additional capital from time to time in order to accomplish the purpose and Business for which the Company is formed. If the Manager determines that the Company requires additional capital, the Manager shall give written notice to the Members. Each of the Members shall have the right, but not the obligation, to make such additional Capital Contributions in accordance with their respective Percentage Interests, or in such other percentages as they shall unanimously agree. If any Member fails to make the additional capital contribution which such Member is entitled to make, then the other Members may, but shall not be obligated to, make the additional capital contribution which such Member did not make in accordance with their respective Percentage Interests among themselves, or in such other percentages as they shall unanimously agree. An additional Capital Contribution shall not be due earlier than ten days following receipt of the Manager's notice thereof.

If the Members do not make all of the additional Capital Contributions, the Manager may raise the additional Capital Contributions from outside third parties by making a Capital Call (as hereinafter defined) and admitting such parties as new Members, so long as such parties agree to be bound by the provisions of this Agreement.

(b) No Member shall be required to make any additional Capital Contributions to the Company.

(c) If the Manager determines in the Manager's reasonable discretion that the Company requires additional Capital Contributions, the Manager shall specify (i) the aggregate amount of additional Capital Contributions the Company is seeking (a "**Capital Call**"), (ii) the terms and conditions of the Membership Interests being offered for the Capital Call, including priorities (if any) as to Distributions of Available Cash and/or Liquidation Proceeds, priorities as to return of Capital Contributions (or multiples thereof), percentage rate of return on Capital Contributions, priorities as to allocations of Profit and Loss, special voting rights and such other matters, and (iii) the price per Membership Interest, provided that all issuances of any equity are done at a value equal to the fair market value of such equity. As further provided in Section 4.3(b)(2), the Manager shall have the right and authority to amend the Agreement without Member consent or approval to reflect the terms of any new class or type of Membership Interests.

(d) Upon issuance of such additional Membership Interests in exchange for a Capital Call, the Manager shall adjust, if applicable, the Capital Accounts of all of the then existing Members on a prospective basis to reflect the implied Gross Asset Value of the Property of the Company, and (ii) execute an amendment to this Agreement, as necessary, to evidence the foregoing and to amend Schedule A to reflect the additional Capital Contributions, new Members, Membership Interests and changed Percentage Interests.

III.3 **Capital Accounts**. The Company shall maintain a separate Capital Account for each Member in accordance with the Tax Exhibit.

III.4 **Capital Withdrawal Rights, Return and Priority**. Except as otherwise expressly provided in this Agreement, (i) no Member will be entitled to withdraw, receive any return of or reduce such Member's Capital Contribution or Capital Account or to receive any Distributions from the Company, (ii) no Member will be entitled to receive Property other than as part of a Distribution declared by the Manager, and (iii) no Member will be entitled to receive or be credited with any interest on any Capital Contribution or the balance in such Member's Capital Account at any time.

III.5 **Loans and Guarantees From Members**.

(a) Any Member or Affiliate of a Member may make (but will not be obligated to make) a loan to the Company in such amounts, at such times and on such terms as may be approved by the Manager as long as such loan is done on commercially reasonable terms

Company pro rata in accordance with their respective Percentage Interests or in such other amounts as agreed to by the Members opting to make any such loans. Loans by any Member or an Affiliate of a Member to the Company will not be considered Capital Contributions to the Company.

(b) No Member will be obligated to guarantee or cause any other Person to guarantee personally or provide any personal collateral to secure the obligations of the Company. If a Member or Affiliate of a Member personally guarantees or provides any personal collateral to secure the obligations of the Company, the Company may pay such Member or Affiliate a reasonable fee for such personal risk as may be approved by the Manager.

(c) Unless otherwise agreed, a Member or an Affiliate of a Member who makes a loan to the Company will have the same rights as an un-affiliated third party to declare a default and to initiate any collection, enforcement or foreclosure actions or proceedings against the Company.

III.6 **No Personal Liability**. Except as otherwise expressly provided in this Agreement, no Member will be personally liable for the return of any Capital Contributions of, or loans made by, the Members or any portion thereof, and the return of Capital Contributions and repayment of loans will be made solely from the Company's assets. The Members will not be personally liable for the payment or performance of the debts and other obligations of the Company, except as and to the extent the Member expressly agrees to be personally bound.

III.7 **No Liability for Restoration of Negative Capital Account**. Notwithstanding anything in this Agreement to the contrary, no Member will have an obligation to make an additional Capital Contribution to the Company to restore a negative Capital Account balance to zero (unless and to the extent such negative Capital Account balance results from an inaccurate or disproportionate Distribution made to or received by a Member that results in another Member having a final positive Capital Account balance).

III.8 **Profit Interests/Options**. The Manager may issue Membership Interests or options to purchase Membership Interests to Persons that provide services to the Company without requiring the Person to make a Capital Contribution, provided that any such Membership Interests are granted as "profit interests" within the meaning of Revenue Procedure 93-27 (as subsequently clarified by Rev. Proc. 2001-43). Any grant or option agreement for Membership Interests issued hereunder to an employee, consultant or other service provider may contain vesting, forfeiture and repurchase provisions, if any, as determined by the Manager. For income tax purposes, pursuant to Rev. Proc. 2001-43, the Company shall treat the grantee of any profit interests subject to vesting as the owner of all the vested and unvested profit interests from the date of grant and the grantee shall take into account the distributive share of Profit, Loss and Credits associated therewith in computing the grantee's income tax liability.

## ARTICLE IV

## AMENDMENTS TO CERTIFICATE AND AGREEMENT

IV.1 **Permissible Amendments**. The Articles and this Agreement may be amended at any time to add a new provision or to change or remove an existing provision in accordance with the terms of the remainder of this Article IV.

IV.2 **Amendment of Articles**.

(a) The Manager may adopt one or more amendments to the Articles without Member approval or action only if the amendment would not have the effect of changing any material term or provision of this Agreement and would not adversely affect the Membership Interest of a Class B Member, Class C Member or their Assignees. If a proposed amendment of the Articles would have the effect of changing any material term or provision of this Agreement, such amendment to the Articles shall be approved in the manner provided in Section 4.3.

(b) Subject to the limitations in Section 4.3(c), the Manager and the Class A Members may adopt an amendment to the Articles authorized in the Act in the following manner:

(1) the Manager shall adopt a resolution setting forth the proposed amendment and directing that it be submitted to a vote at a meeting of the Class A Members; written notice setting forth the proposed amendment or a summary of the changes to be effected thereby shall be given to each Class A Member;

on the proposed amendment, and the proposed amendment shall be adopted upon receiving approval by a Majority in Interest of the Class A Members, and such other vote as would be required if the substance of the proposed amendment were proposed as an amendment to this Agreement; and

(c) any number of amendments may be submitted to the Class A Members and voted upon by them at one meeting.

IV.3 **Amendment of Agreement**.

(a) Exception as otherwise provided in Article IV, this Agreement may be amended or modified from time to time as follows:

(1) the Manager shall adopt a resolution setting forth the proposed amendment and directing that it be submitted to a vote at a meeting of the Class A Members; written notice setting forth the proposed amendment or a summary of the changes to be effected thereby shall be given to all Members;

(2) the Class A Members, in any manner provided by Article VI, shall vote on the proposed amendment, and the proposed amendment shall be adopted upon receiving approval by a Majority in Interest of the Class A Members or such other vote as specifically required to amend a provision hereunder; and

(3) any number of amendments may be submitted to the Class A Members and voted upon by them at one meeting.

(b) The Manager shall have the power to amend this Agreement without the consent of the Members as may be required to facilitate or implement any of the following purposes:

(1) to correct any errors or omissions, to cure any ambiguity, or to cure any provision that may be inconsistent with any other provision of this Agreement;

(2) to reflect the creation and/or issuance of additional Membership Interests or the admission, substitution, termination, or withdrawal of Members in accordance with this Agreement, including amending Schedule A;

(3) to satisfy any requirements, conditions, or guidelines contained in any order, directive, opinion, ruling or regulation of a federal, state or local agency or contained in federal, state or local law.

(c) Notwithstanding the foregoing or any other provision of this Agreement, neither this Agreement nor the Articles shall be amended, and no action may be taken by the Manager, the Class A Members, or the Company, without the written consent of each Member adversely affected if the amendment or action would:

(1) modify the limited liability of a Member;

(2) alter the rights of any Member to receive Distributions specified herein; provided, however, that an alteration of Distributions shall be permitted (A) to the extent resulting from the creation and/or issuance of additional Membership Interests in accordance with this Agreement or (B) if the alteration is applicable to all Members owning a class or series of Membership Interests (pro rata in accordance with relative Membership Interests of the class or series) if the amendment is approved by the Members owning a majority of the Membership Interests of the class or series;

(3) reduce the required vote or consent of the Members with respect to any matter in this Agreement; provided, however, that this Agreement may be amended to change the required vote or consent of Members with respect to a matter in this Agreement if the amendment is approved by Members constituting the required vote or consent theretofore required (the default voting for any action if not otherwise indicated is a Majority in Interest of the Class A Interests); or

(4) amend Section 3.2, Section 4.2, Section 4.3, or Section 12.

**ARTICLE V**

V.1 **Non-Liquidation Cash Distributions**.  The amount, if any, of Available Cash (other than Liquidation Proceeds distributed in liquidation of the Company, which shall be distributed in accordance with Section 5.3) shall be determined by the Manager from time to time and shall be distributed to the Members from time to time as determined by the Manager, subject to the provisions of any Award Agreement, as follows:

(a) Available Cash generated by Domestic Operations shall be distributed pro rata among the Class A Members and Class B Members in accordance with their respective Domestic Distribution Percentages.

(b) Available Cash generated by International Operations shall be distributed pro rata among the Class A Members and Class C Members in accordance with their respective International Distribution Percentages.

V.2 **Tax Distributions**.  Any provision of this Agreement to the contrary notwithstanding, the Company shall distribute Available Cash (to the extent not prohibited pursuant to an agreement entered into by the Company or otherwise prohibited by law) to the Members sufficient for the Members to pay federal and state income taxes attributable to income and gain allocated to them pursuant to the Tax Exhibit, assuming each Member is subject to the highest marginal federal and state income tax rates applicable to any Member, and giving effect to the character of the income and the deductibility of state income taxes for federal income tax purposes.  All amounts distributed pursuant to this Section 5.2 shall be treated as amounts distributed to the relevant Member pursuant to Section 5.1 and all amounts withheld pursuant to the Code or any provisions of state or local tax law with respect to any payment or distribution to the Member from the Company shall be treated as amounts distributed to the relevant Members pursuant to Section 5.1 or this Section 5.2, as applicable; provided, that, that no Distribution shall be made if the Distribution would cause the Member to have a deficit balance in the Member's Capital Account.

V.3 **Liquidation Distributions**.  Liquidation Proceeds shall be Distributed in the following order of priority, subject to the provisions of any Award Agreement:

(a) To the payment of debts and liabilities of the Company (including to Members to the extent otherwise permitted by law) and the expenses of liquidation; then

(b) To the setting up of such reserves as the Person required or authorized by law to wind up the Company's affairs may reasonably deem necessary or appropriate for any disputed, contingent or unforeseen liabilities or obligations of the Company, provided that any such reserves shall be held for such period as such Person shall deem advisable for the purpose of applying such reserves to the payment of such liabilities or obligations and, at the expiration of such period, the balance of such reserves, if any, shall be distributed as hereinafter provided; then

(c) To each Member (and among the Members pro rata in the ratio of their respective unreturned Capital Contributions) to the extent of each Member's unreturned Capital Contributions until the aggregate amount of all Distributions at any time made or deemed made to each Member pursuant to this paragraph (c) is equal to the aggregate Capital Contributions made by such Member to the Company in respect of such Membership Interests; then

(d) The remainder of the Liquidation Proceeds as follows:

(1) Liquidation Proceeds attributable to Domestic Operations shall be distributed pro rata among the Class A Members and Class B Members in accordance with their respective Domestic Distribution Percentages.

(2) Liquidation Proceeds attributable to International Operations shall be distributed pro rata among the Class A Member and Class C Members in accordance with their respective International Distribution Percentages.

(e) To the Members in accordance with their respective Capital Accounts; provided, however, that if the Manager establishes any reserves in accordance with the provisions of Section 5.3(b), then the distributions pursuant to this Section 5.3(e) (including distributions of such reserve) shall be pro rata in accordance with the balances of the Members' Capital Accounts.

V.4 **Allocation of Profit, Loss and Credits**.  All Profits and Losses shall be allocated to the Members as set forth in the Tax Exhibit.

Manager is authorized to take any action that it determines to be necessary or appropriate to cause the Company to comply with any withholding, estimated tax or similar requirements established under any federal, state or local tax law, including, without limitation, withholding on any distribution to any Member and/or requiring that a Member pay to the Company any amount required by the Company to pay over to a governmental authority as a withholding, estimated tax or similar payment on behalf of such Member. For all purposes of this Article V, any amount withheld on any distribution and paid over to the appropriate governmental body will be treated as if such amount had in fact been distributed to the Member. Each Member agrees to execute such consents and elections as may be required by the taxing authority of any state or local government in which the Company does business and generates taxable income so that the Company will not be required to withhold on the taxable income of the Company allocated to such Member for such state or locality.

V.6 **Reserves**. The Manager will have the right to establish, maintain and expend reasonable Reserves to provide for working capital, debt service, expected operating deficits, deferred maintenance, facility expansions, replacements, and future investments reasonably anticipated by the Manager, and for such other purposes as the Manager may deem necessary or advisable.

V.7 **Guaranteed Payments**. In an amount and manner as determined by the Manager, from time to time, Members who are also employees or service providers of the Company shall be entitled to receive payments in compensation for performing such services for and/or on behalf of the Company (each, a "**Guaranteed Payment**"). All Guaranteed Payments shall constitute a "guaranteed payment" within the meaning of Section 707(c) of the Code.

## ARTICLE VI
## MEMBERS' MEETINGS

VI.1 **Meetings of Members; Place of Meetings**. An annual meeting of the Members may be held as the Manager determines, but shall not be required. Special meetings may be called at any time by the Manager, by Class A Members with a Majority in Interest. Meetings of the Members may be held for any purpose or purposes. All meetings of the Members will be held at such place designated by the Manager. The Members entitled to participate may participate in a meeting by means of conference telephone or similar communication equipment in compliance with the Act whereby all of the Members participating in the meeting can hear each other, and participation in a meeting in this manner will constitute presence in person at the meeting.

VI.2 **Voting; Voting Requirement**. Each Class A Member shall have a right to vote his, her or its Class A Interests on all matters generally submitted to a vote of the Class A Members. Unless otherwise specified herein or required by the Act, the Class B and C Members shall not be entitled to vote their Class B and C Interests on any matter requiring approval of the Members generally. If a Class A Member Transfers his Class A Interests to an Assignee who has not been approved as a Substitute Member, neither the Assignee nor the Class A Member transferring such Class A Interests shall be entitled to vote such Class A Interests. A Majority in Interest of the Class A Members is required to approve any action or proposal before the Class A Members, unless the vote of a greater number is required by the Act, the Articles or this Agreement. If the vote of the Class B and/or Class C Interests are required herein or by the Act, a Majority in Interest of the Class B Members is required to approve any action or proposal before the Class B Members, unless the vote of a greater number is required by the Act, the Articles or this Agreement, and a Majority in Interest of the Class C Members is required to approve any action or proposal before the Class C Members, unless the vote of a greater number is required by the Act, the Articles or this Agreement.

VI.3 **Notice**. Written notice stating the place, day and hour of each meeting and, in the case of a special meeting, the purpose for which the meeting is called will be delivered not less than twenty-four (24) hours before the date of the meeting, either personally, by mail or by electronic mail, by or at the direction of the person calling the meeting, to each Member entitled to vote at such meeting. Notice to Members, (i) if mailed, will be deemed delivered as to any Member when deposited in the United States mail, addressed to the Member at its usual place of business or last known address, with postage prepaid and (ii) if sent by electronic mail, will be deemed delivered as to any Member when sent to the electronic mail address last provided to the Company by such Member with affirmative confirmation of receipt from such Member. The Company shall give the Class B and C Members a courtesy written notice of each meeting.

VI.4 **Waiver of Notice**. When any notice is required to be given to any Member, a waiver thereof in writing signed by the Member, whether before, at, or after the time stated therein, or any attendance of the Member at the meeting (other than at the beginning of the

VI.5 **Action Without Meeting**. Any approval or action required or permitted to be taken by the Members may be taken without a meeting if the action is evidenced by one or more written consents or documents constituting or describing the action to be taken, signed by a Member or Members having the requisite aggregate ownership interest which would be necessary to authorize or take such action at a meeting at which all Members entitled to vote were present and voting. A copy of such written consent to action will be given to each Member not so consenting or not entitled to vote but who are entitled under the Act to notice of the action taken.

VI.6 **Conflict of Interest; Non-Compete**.

(a) Each Member understands and acknowledges that the conduct of the Company's Business may involve business dealings and undertakings with Members, the Managers and their Affiliates. In any such event, those dealings and undertakings shall be at arm's length terms and on commercially reasonable terms, and no Manager or officer shall use the Manager's or officer's office to obtain favorable treatment for or on behalf of a Manager or officer, Affiliates or others which would not otherwise be received in an arm's length transaction.

(b) Each Member agrees that, while such Member is a Member of the Company, such Member will not, and shall cause such Member's Affiliates not to, directly or indirectly, without the express written consent of the Company:

(1) own or have an interest in or act as an officer, director, partner, principal, shareholder, sole proprietor, employee, agent, representative, consultant, member, manager or independent contractor of any proprietorship, partnership, firm, trust, corporation, limited liability company, or other Organization that operates a business that directly competes with the Company's Business in the geographic area in which the Company does business;

(2) hire, attempt to hire, or entice or induce, or attempt to entice or induce or in any manner influence any person who is in the employ or service of the Company to leave such employ or service of the Company, or in any way interfere with the relationship between any such employee or independent contractor of the Company; or

(3) solicit, interfere with, or endeavor to entice away from the Company any person who is or may become a supplier or customer of the Company to terminate or not enter into such relationship with the Company.

Notwithstanding the foregoing, a Member may own up to one percent (1%) of the outstanding equity securities in any entity which is a competitor of the Company which is listed upon a national stock exchange or actively traded in the over-the-counter market.

VI.7 **Confidentiality**. Each of the Manager and the Members shall treat as confidential and will not disclose to any third party or use for his or her gain any non-public and confidential information regarding the Company, the Managers, Members, and each of their respective Affiliates, other than as necessary in the ordinary course of and to further the Business of the Company or as required by law, without the prior written consent of the Manager; provided, however, the Company, the Managers and the Members may disclose such information to their respective attorneys, accountants and other professional advisors who have a need for such information provided that such persons are informed of the confidential nature of the information and are directed to maintain the confidentiality thereof. The confidentiality obligations of each Member will survive any termination of the membership of such Member in the Company. The confidentiality obligations of a Manager or Member will survive any termination of such status for a period of three (3) years.

VI.8 **Enforcement**.

(a) Each Member acknowledges that such Member has carefully read and considered the provisions of Sections 6.6 and 6.7 and, having done so, agrees that the restrictions set forth herein (including, but not limited to, the time periods and scope restrictions herein) are fair and reasonable and are reasonably required for the protection of the interests of the Company.

(b) Each Member covenants and agrees that if such Member violates any of such Member's covenants or agreements under Sections 6.6 and 6.7, the Company will be

remunerations or benefits which such Member directly or indirectly has realized and/or may realize as a result of, growing out of or in connection with any such violation. Such remedy will be in addition to, and not in limitation of, any injunctive relief or other rights or remedies to which the Company is or may be entitled at law or in equity or under this Agreement.

(c) If any of the provisions of Sections 6.6, 6.7 and this 6.8 is held to be invalid or unenforceable, the remaining provisions will nevertheless continue to be valid and enforceable as though the invalid or unenforceable parts had not been included therein. If any provision of Sections 6.6 and 6.7 relating to time period and/or scope of restriction will be declared by a court of competent jurisdiction to exceed the maximum time period or scope such court deems reasonable and enforceable, said time period and/or scope of restriction will be deemed to become and thereafter be the maximum time period and/or scope which such court deems reasonable and enforceable.

VI.9 **Member Representations and Warranties**. Each Member hereby represents and warrants to the Company and each other Member that:

(a) if that Member is an Organization, it is duly organized, validly existing, and in good standing under the laws of its state of organization and that it has full organizational power to execute and agree to the Agreement and to perform its obligations hereunder;

(b) the Member is acquiring or has acquired Membership Interests in the Company for the Member's own account as an investment and without an intent to distribute the Membership Interests;

(c) the Member acknowledges that the Membership Interests have not been registered under the Securities Act of 1933, as amended, or any state securities laws, and may not be resold or transferred by the Member without appropriate registration or the availability of an exemption from these requirements;

(d) this Agreement is the Member's legal, valid and binding obligation, enforceable against the Member in accordance with its terms;

(e) the execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in the breach of any of the terms of, or constitute a default under, any agreement or document to which the Member is a party or by which the Member is bound, or to the Member's best knowledge, any order, rule or regulation of any court or other governmental agency or official; and

(f) the Member has and will maintain the requisite licenses necessary to comply with all regulatory requirements attendant to his or her ownership.

## ARTICLE VII
## MANAGEMENT

VII.1 **The Manager**.

(a) The Business and affairs of the Company will be managed and governed by its sole Manager. Except for situations in which the approval of the Members is expressly required by this Agreement or by nonwaivable provisions of the Act, the Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and Property of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's Business. The Manager shall not have the right to delegate to any Person (other than an appropriate officer or employee) any of the Manager's rights or powers to manage or control the Business and affairs of the Company.

(b) The Manager shall be Michael E. Griffin until his removal, resignation or death.

VII.2 **Removal and Replacement of Manager**.

(a) Upon a death, resignation or removal of the Manager, the Class A Members shall have the sole right to act to select a successor Manager.

(b) A Manager may only be removed if the Manager commits an act of Willful Misconduct, and a Majority in Interest of the Class A Members vote to remove such Manager; provided, however, any person who is a Manager, desires to be a Manager or is

employees or other agents of Management must at all times conduct themselves so as to avoid any violation of any securities laws. The removal of a Manager who is also a Member shall not affect the rights of the Manager as a Member and shall not constitute a withdrawal of that Member.

(c) A Manager may resign at any time by giving notice to the Company. The resignation of the Manager shall take effect upon receipt of notice thereof or at such later date specified in the notice; and, unless otherwise specified therein, the acceptance of the resignation shall not be necessary to make it effective. A Manager that dies or becomes permanently disabled shall be deemed to have resigned and given notice at the time of the death or permanent disability of the Manager pursuant to this Section 7.2. The resignation of a Manager who is also a Member shall not affect the rights of the Manager as a Member and shall not constitute a withdrawal of that Member.

VII.3 **Manager's Duty to Company**. A Manager shall not be required to dedicate his full time and attention to the Company's Business, and may have other business interests and engage in activities in addition to those relating to the Company, except as otherwise provided herein.

VII.4 **Authority of the Manager**. Without limiting the general powers of the Manager set forth in Section 7.1, the Manager shall have power and authority, on behalf of the Company without requiring approval from any Members, to make the following decisions and take the following actions for and on behalf of the Company, all subject to any limitations set forth in this Agreement or in the Act:

(a) Select officers and make employment decisions and policies relating to officers, employees, agents, and independent contractors of the Company;

(b) Enter into any and all other agreements on behalf of the Company, in such forms as the Manager may approve, including leases, maintenance agreements and major repair and construction contracts;

(c) Establish bank accounts and investment accounts, with such signatories as designated by the Manager;

(d) Borrow money for the Company on such terms as the Manager shall deem appropriate (including from any Members or Affiliates of a Member so long as borrowings from such Members or Affiliates are on reasonable arms-length terms and to hypothecate, encumber and grant security interests in the Property of the Company on commercially reasonable terms;

(e) Execute on behalf of the Company all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage or transfer of Company Property, assignments, bills of sale, leases, and any other documents or instruments necessary to the Business of the Company;

(f) Make temporary investment of funds of the Company in short term investments where there is appropriate safety of principal;

(g) To: (i) bring or defend, pay, collect, compromise, arbitrate, resort to legal action or otherwise adjust claims or demands of or against the Company; (ii) make or revoke any election available to the Company under any tax law; (iii) enforce the Company's rights and perform its obligations under all agreements to which the Company is a party; (iv) carry out the decisions of the Members made in accordance with this Agreement; (v) prepare, execute, and file any documents required to be filed with any government authority; and (vi) expend Company funds necessary or appropriate to effect any of the foregoing;.

(h) Purchase, lease or otherwise acquire, or sell, lease or otherwise dispose of, any personal property or real property interest;

(i) Acquire by redemption or otherwise the Membership Interests of any Member;

(j) Authorize an amendment to the Articles and this Agreement consistent with the provisions of this Agreement and the Act;

(k) Make selections and decisions relating to the Company's legal, accounting and other professional advisors;

Property;

(m) File for Bankruptcy or to cease operations;

(n) Merge, consolidate or combine with or into another entity, or do an equity exchange with any other Organization;

(o) Convert the Company to a corporation (or other type of Organization) by merger, conversion, operation of law, or redomesticate the Company; or

(p) Sell or otherwise dispose of all or substantially all of the Property of the Company; and

(q) Approval of all documents and agreements, and the exercise of all rights and remedies, of the Company in connection with the foregoing.

VII.5 **Compensation; Reimbursements**.

(a) Except as otherwise expressly provided in this Agreement, the Manager and, if specifically authorized by the Manager, each Member will be entitled to reimbursement from the Company for all reasonable and documented direct out-of-pocket expenses incurred at the request or direction of the Manager on behalf of the Company as contemplated in this Agreement.

(b) Except for the repayment of expenses incurred by the Manager, the Manager, as such, shall not be entitled to compensation from the Company for serving as a Manager of the Company.

(c) For the avoidance of doubt, the Company may enter into an agreement with a Member, a Manager or an officer, director, employee, owner or other Affiliate of a Member for such Person to render employment or other specific services to the Company and to receive reasonable compensation for such employment or other services as approved by the Manager.

(d) As contemplated by Section 5.7, any compensation paid to a Member or a Manager who is also a Member for its services as a Member or a Manager will be treated as a "guaranteed payment" under Section 707(c) of the Code.

VII.6 **Officers**. The Manager may appoint and remove from time to time such officers of the Company as the Manager determines advisable, each of whom shall exercise such powers and perform such duties as shall be determined by the Manager from time to time.

VII.7 **Power to Bind the Company**. Only a Manager and officers of the Company pursuant to authority granted by the Manager shall have the authority to bind the Company. Unless authorized to do so by the Manager, no attorney-in-fact, employee, or other agent of the Company (other than officers duly authorized by the Manager) shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose. No Member shall have any power or authority to bind the Company unless the Member has been authorized by the Manager to act as an agent of the Company in accordance with the previous sentence.

## ARTICLE VIII

## STANDARD OF CARE; LIMITED LIABILITY AND INDEMNIFICATION

VIII.1 **Limitation of Liability**. A Manager's and officers' duty of care in the discharge of his or her duties to the Company is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law which results or shall have resulted in material loss or injury to the Property or operations of the Company. A Manager and officer shall be fully protected in discharging his or her duties in relying in good faith upon the records required to be maintained by the Company and upon the information, opinions, reports or statements by any other Manager, officer, or agents, or by any other Person, as to matters a Manager or officer reasonably believes are within the other Person's professional or expert competence and who has been selected with reasonable care by, or on behalf of, the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which Distributions to Members might properly be paid. Each of the Members and Assignees hereby holds harmless (to the extent of the Members or Assignee's share of the Property of the Company), and waives any claim against the Manager

allocations, income, losses, damages, liabilities, claims, leases, contracts, mileage, demand and expenses or any other act or failure to act arising from or out of a Manager's or officer's duties provided the action or failure to act complies with the standard of conduct set forth in the first sentence of this Section 8.1. The Members hereby acknowledge and agree that the Managers and officers shall have no fiduciary duty of care except as to obligations expressly set forth in this Agreement.

VIII.2 **Indemnification**. The Company will indemnify each officer and Manager (each a "**Covered Person**") to the fullest extent permitted by the Act, but such indemnity will not extend to any conduct by the party seeking indemnification that is determined by a court of competent jurisdiction to constitute bad faith, fraud, gross negligence, or willful misconduct. Any indemnity under this Section 8.2 will be paid from, and only to the extent of, Company assets and no Member will have any personal liability on account thereof.

VIII.3 **Expenses**. To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding relating to the Company will, from time to time, be advanced by the Company before the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it is determined that the Covered Person is not entitled to be indemnified as authorized in this Article VIII.

VIII.4 **No Application to Independent Contractor Status**. The provisions of this Article VIII will not apply to any services or acts of a Member or Manager as an independent contractor of the Company.

VIII.5 **Insurance**. The Company may purchase and maintain insurance on behalf of the Covered Persons against insurable liabilities asserted against them and incurred by them in such capacity, or arising out of their status as a Covered Person, whether or not the Company is obligated to indemnify them against such liabilities under this Article VIII.

**ARTICLE IX**
**ACCOUNTING AND BANK ACCOUNTS**

IX.1 **Fiscal Year and Accounting Method**. The fiscal year and taxable year of the Company will be the calendar year. The Manager will determine the accounting method to be used by the Company.

IX.2 **Books and Records**.

(a) The books of account of the Company, and all securities, papers, and writings of the Company shall be kept at the principal place of business of the Company, or another place as determined by the Manager. Each Member (or such Member's designated agent or representative) will have the right, during ordinary business hours and upon reasonable advance written notice stating the purpose for which the information is sought, to inspect and copy (at such Member's own expense) the following books and records of the Company (other than those containing trade secrets or similar confidential information) for any purpose reasonably related to the Member's Membership Interest:

(1) Copies of the Company's federal, state and local income tax returns;

(2) Current list of names and addresses of each Manager, the Members and Assignees;

(3) Copies of the Articles and this Agreement, all amendments thereto, and copies of any written powers of attorney used to execute any of the foregoing;

(4) Copies of financial statements of the Company for the three most recent years;

(5) Information regarding the amount, description and value of Capital Contributions made or agreed to be made by each Member; and

(6) Any other information regarding the financial condition and affairs of the Company that is just and reasonable.

(b) A Member, upon demand by the Company, shall reimburse the Company the cost of labor and materials associated with generating copies of the records to inspect.

(c) Notwithstanding the provisions of this Section 9.2, the Manager shall have the

deem reasonable, any information which the Manager reasonably shall believe to be in the nature of trade secrets or other information the disclosure of which the Manager in good faith shall believe is not in the best interest of the Company or could damage the Company or its Business or which the Company is required by law or by agreement with a third party to keep confidential. The Members agree and acknowledge that the Manager may keep confidential from each Member information regarding the Percentage Interest, and the number and type of Membership Interests of the other Members.

IX.3 **Taxation as Partnership**. The Company will be treated as a "partnership" for Federal and state income tax purposes. All provisions of this Agreement and the Articles will be construed and applied so as to preserve that tax status.

IX.4 **Tax Returns and Elections; Partnership Representative**.

(a) The Company will cause to be prepared and timely filed all federal, state and local income tax returns or other returns or statements required by applicable law. The Company will claim all deductions and make such elections for federal or state income tax purposes which the Manager reasonably believes will produce the most favorable tax results for the Members.

(b) Michael Griffin is the "partnership representative" of the Company pursuant to the provisions of Code §6223, as amended by the Revised Partnership Audit Procedures, as well as for purposes of any state, local, or non-U.S. tax law (collectively, the "**Partnership Representative**"). Each Member shall execute, certify, acknowledge, deliver, swear to, file and record all documents necessary or appropriate to evidence its approval of this designation. In such capacity the Partnership Representative shall represent the Company in any disputes, controversies or proceedings with the Internal Revenue Service or with any state, local, or non-U.S. taxing authority and is hereby authorized to take any and all actions that it is permitted to take by applicable legal requirements when acting in that capacity. The Partnership Representative shall be entitled to take such actions on behalf of the Company in any and all proceedings with the Internal Revenue Service and any other taxing authority as it reasonably determines to be appropriate and that is consistent with this <u>Section 9.4</u>, shall be reimbursed by the Company for all out-of-pocket costs and expenses reasonably incurred in connection with any such proceeding, and shall be indemnified by the Company (solely out of Company assets) with respect to any action brought against such Partnership Representative in connection with the settlement of any such proceeding. The Company shall indemnify the Partnership Representative for, and hold it harmless against, any claims made against it in its capacity as Partnership Representative, except any claims arising out of or relating to the gross negligence or willful misconduct of Partnership Representative. Nothing in this <u>Section 9.4</u> limits the ability of any Member to take any action in its individual capacity relating to the Company that is left to the determination of an individual Member under Sections 6222 to 6231 of the Code or any similar provision of state or local law. Expenses incurred by the Partnership Representative shall be borne by the Company. Such expenses shall include fees of attorneys and other tax professionals, accountants, appraisers and experts, filing fees and reasonable out-of-pocket costs and expenses. Any decisions made by the Partnership Representative, including whether or not to settle or contest any tax matter, whether or not to extend the period of limitations for the assessment or collection of any tax and the choice of forum for such contest shall be made in the Partnership Representative's sole and absolute discretion.

(c) The Members acknowledge and agree that it is the intention of the Members to minimize any obligations of the Company to pay taxes and interest in connection with any audit of the Company, including, by means of elections under Code §6226 and/or the Members filing amended returns under Code §6225(c)(2), in each case as amended by the Revised Partnership Audit Procedures. The Members agree to cooperate in good faith, including by timely providing information reasonably requested by the Partnership Representative and making elections and filing amended returns reasonably requested by the Partnership Representative, and the Partnership Representative shall make such elections as it determines in its discretion, to give effect to the preceding sentence. The Company shall make any payments it may be required to make under the Revised Partnership Audit Procedures and the Partnership Representative shall allocate any such payment among the current or former Members of the Company for the "reviewed year" to which the payment relates in a manner that reflects the current or former Members' respective interests in the Company for such "reviewed year" and any other factors taken into account in determining the amount of the payment. To the extent payments are made by the Company on behalf of or with respect to a current Member in accordance with this <u>Section 9.4</u>, such amounts shall, at the election of the Partnership Representative, (i) be

applied to and reduce the next distribution(s) otherwise payable to such Member under this Agreement or (ii) be paid by the Member to the Company within 30 days of written notice from the Partnership Representative requesting the payment. In addition, if any such payment is made on behalf of or with respect to a former Member, that Member shall pay over to the Company an amount equal to the amount of such payment made on behalf of or with respect to it within 30 days of written notice from the Partnership Representative requesting the payment. The provisions contained in this Section 9.4 shall survive the dissolution of the Company and the withdrawal of any Member or the Transfer of any Member's interest in the Company.

IX.5 **Section 754 Election**. In the event a distribution of Company assets occurs which satisfies the provisions of Section 734 of the Code or in the event a Transfer of Membership Interests occurs which satisfies the provisions of Section 743 of the Code, upon a determination by the Manager, the Company will elect, in accordance with Section 754 of the Code, to adjust the basis of the Company's property to the extent allowed by such Section 734 or 743 and will cause such adjustments to be made and maintained. Any additional accounting expenses incurred by the Company in connection with making or maintaining any such basis adjustment will be reimbursed to the Company from time to time by the distributee or transferee who benefits from the making and maintenance of such basis adjustment. Each Member will provide the Company with such information and such other cooperation as may be necessary to receive from such Member in order for such election to be made and effected.

IX.6 **Bank Accounts**. All funds of the Company will be deposited in a separate bank, money market or similar account(s) in the Company's name at financial institutions designated by the Manager; provided, that the financial institution shall be an institution whose deposit accounts are insured, to the full extent permitted by law, by the Federal Deposit Insurance Corporation, or by any successor agency or entity. Withdrawals (by check or otherwise) therefrom will be made only by the signature of persons authorized by the Manager to do so.

## ARTICLE X

## TRANSFERS OF MEMBERSHIP INTERESTS; ADDITIONAL MEMBERS AND CAPITAL CONTRIBUTIONS

X.1 **General Restrictions**. No Member may Transfer all or any part of such Member's Membership Interests (including any Distribution and Allocation rights associated with such Membership Interest), except (i) as otherwise expressly permitted in this Agreement, or (ii) with approval by the Manager. Any purported Transfer of all or any part of Membership Interests in violation of the terms of this Agreement, including an Involuntary Transfer (an "**Unauthorized Transfer**") will be void and of no effect whatsoever; provided, however, that if the Company is required under the Act or other applicable law to recognize an Unauthorized Transfer (including an Involuntary Transfer), the Person to whom such Membership Interests are Transferred will have only the Distribution and/or Allocation rights (collectively "**Economic Rights**") of an Assignee with respect to the Transferred Membership Interests and any Distributions with respect to such Transferred Membership Interests may be applied (without limiting any other legal or equitable rights of the Company) towards the satisfaction of any debts, obligations or liabilities for damages that the transferor or transferee of such Membership Interests may have to the Company. A permitted Transfer will be effective as of the date specified in the instruments relating thereto. Any Assignee desiring to make a further Transfer will be subject to all of the provisions of this Article X to the same extent and in the same manner as any other Member desiring to make any Transfer.

X.2 **Permitted Transfers**. Notwithstanding the foregoing, the following Transfers of Membership Interests will not require approval by the Manager under Section 10.1 above:

(a) Transfers of Membership Interests (A) to a revocable trust of which the Member is the grantor, the trustee and the primary beneficiary during the Member's lifetime, and (B) from such revocable trust to the original Member;

(b) Transfers of Interests from a Member (or a trust established by such Member), to the Member's spouse and/or lineal descendants upon the death of the original Member; and

(c) Transfers of Membership Interests in accordance with Section 10.7.

For the avoidance of doubt, if a Class B/C Member dies, none of the estate of the deceased Class B/C Member, any trust or its beneficiaries, or any heirs or assigns of or related to such deceased Class B/C Member shall become a Substitute Member without approval of the Manager; it being intended that the Assignee of such deceased Class B/C Member shall only

have Economic Rights with respect to its transferred Class A Interest or Class C Interest, as applicable, and any such Transfer will be deemed to be an Unauthorized Transfer. If a Class A Member dies, the spouse and/or lineal descendants of the original Class A Member, or any trust for the their benefit, as contemplated by Section 10.2(b) above, shall become a Substitute Member without the requirement of an approval of the Manager. If the Class A Member is also a Manager, the Substitute Class A Member shall have the right to appoint a successor Manager as contemplated by Section 7.2 and in accordance with this Agreement.

X.3 **Substitute Members**. Except in the case of death of a Class A Member as provided above, no Assignee of all or part of a Member's Membership Interests therein will become a **"Substitute Member"** in place of the assignor with all of the rights and obligations of a Member unless and until:

(a) The Transfer complies with the provisions of Section 10.1.

(b) The assignor Member states that such assignor Member intends for the Assignee to be admitted as a Substitute Member of the Company in the instrument of assignment;

(c) The Assignee has executed an instrument accepting and adopting the terms and provisions of this Agreement as a Member;

(d) The assignor or Assignee has paid all reasonable expenses of the Company in connection with the admission of the Assignee as a Substitute Member; and

(e) The Manager has approved such Assignee becoming a Substitute Member, which approval may be withheld for any or no reason.

Upon satisfaction of all of the foregoing conditions with respect to a particular Assignee, the Manager will cause this Agreement (including Schedule A) to be duly amended to reflect the admission of the Assignee as a Substitute Member. In the case of death of a Class A Member, the spouse and/or lineal descendants of the original Class A Member, or any trust for the their benefit, as contemplated by Section 10.2(b) above, shall become a Substitute Member upon such Assignee executing an instrument accepting and adopting the terms and provisions of this Agreement as a Member.

X.4 **Effect of Admission as a Substitute Member**. Unless and until admitted as a Substitute Member in accordance with Section 10.3 or as provided in this Agreement, a permitted Transferee of all or a part of a Member's Membership Interests is only an Assignee, and such Assignee will be entitled to receive the specific Economic Rights Transferred to the Assignee to which the assignor would otherwise be entitled to receive. A permitted Assignee who has become a Substitute Member has, to the extent of the Membership Interests Transferred to such Assignee, all the rights and powers of the Person for whom such Assignee is substituted as the Member and is subject to the restrictions and liabilities of a Member under this Agreement and the Act.

X.5 **Admission of Additional Members**. A Person shall be admitted as an additional Member of the Company only with the consent of the Manager or in accordance with this Agreement. Subject to the other provisions of this Agreement, the Manager shall determine the Capital Contributions of each additional Member and the number of Membership Interests issued to each additional Member in accordance with Section 3.2.

X.6 **Dissociation**.

(a) No Member will have the right or power, and no Member will voluntarily attempt to effect a Dissociation from the Company. Any act or purported act of a Member in violation of this Section 10.6 will be void and of no effect. If a Member exercises any non-waivable statutory right to voluntarily Dissociate from the Company, such Dissociation will be a default or breach by the Member of its obligations under this Agreement and the Company may recover from such Member any damages incurred by the Company as a result of such Dissociation and offset the damages against any amounts payable to such Member under the Act, the Articles or this Agreement.

(b) A Class B or Class C Member shall be involuntarily Disassociated from the Company upon the occurrence of any of the following events:

(1) The Class B or C Member (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition of Bankruptcy, (iii) is adjudged bankrupt or insolvent or there is entered against the Class B or C Member an order for relief in any bankruptcy or insolvency proceeding, (iv) files a petition or answer seeking for the Class B or C Member any reorganization, arrangement, composition,

regulation, (v) seeks, consents to, or acquiesces in the appointment of a trustee or a receiver or liquidation of, the Class B or C Member or all or any substantial part of the Class B or C Member's properties, (vi) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Class B or C Member in any proceeding described in Subsections (i) through (v) above;

(2) the Class B or C Member becomes subject to any order of any court compelling Transfer of legal or beneficial ownership of any Class B or C Interests;

(3) the Class B or C Member's death or the adjudication by a court of competent jurisdiction that the Class B of C Member is incompetent to manage the Class B or C Member's person or Property;

(4) an attempted Transfer of all or a portion of the Class B of C Member's Class B or C Interests not in compliance with the provisions of Article X;

(5) the Class B or C Member ceases to be employed or engaged by the Company, for any reason; or

(6) the Class B or C Member ceases to possess the requisite licenses necessary to comply with all regulatory requirements attendant to the ownership of his or her Class B Interests.

(c) Upon a Class B/C Member's Dissociation from the Company as set forth in Section 10.6(b), the Dissociated Member shall only hold the Economic Rights with respect to his or her Class B Interest or Class C Interest, as applicable.

(d) Notwithstanding the Dissociation of any Member, at no time shall the Company be obligated to purchase the Membership Interests of a Dissociated Member, and each Member hereby waives any right that may be granted or available under common law or any other applicable provisions of the Act (including Section 35.55 and Section 35.60 of the Act) or otherwise to require the Company to purchase his, her, or its Membership Interests in the event of withdrawal or resignation.

X.7 **Purchase of a Dissociated Member's Membership Interests**.

(a) Upon the Dissociation of a Class B/C Member (such Class B/C Member together with its Assignee, legal or personal representative, or other applicable successor are herein called the "**Selling Member**"), the Company (or its assigns) shall have the right and option to purchase, but not the obligation, the Selling Member's Membership Interests as provided in this Section 10.7(a), and, upon the Company's election to purchase, the Selling Member shall have the obligation to sell the Selling Member's Membership Interests to the Company (or its assigns). The Company may exercise its option to purchase hereunder by giving the Selling Member written notice of its election to purchase the Selling Member's Membership Interests at any time within six months following the date of such Dissociation event (the "**Valuation Date**"). The purchase price for the Membership Interest to be purchased by the Company in accordance with this Section 10.7(a) will be as follows:

(1) If the Dissociation occurred as a result of an event set forth in Section 10.6(b)(1)-(4), the purchase price shall equal the Agreed Value of such Membership Interests as of the Valuation Date;

(2) If the Dissociation occurred as a result of an event set forth in Section 10.6(b)(5), and such termination of employment or engagement was for any other reason except For Cause, the purchase price shall equal the Agreed Value of such Membership Interests as of the Valuation Date; and

(3) If the Dissociation occurred as a result of an event set forth in Section 10.6(b)(5), and termination of employment or engagement was For Cause, the purchase price shall equal the Forfeiture Value of such Membership Interests as of the Valuation Date..

(b) In the event that the Company does not elect to exercise its option to purchase the Selling Member's Membership Interests pursuant to this Section 10.7, the holder thereof shall not become a Substitute Member of the Company and shall have only Economic Rights with respect to such Membership Interests.

(1) "**Agreed Value**" means, (i) with respect to the Class B Interests held by a Selling Member, the fair market value of such Class B Interests shall be determined based upon the going concern value of the Domestic Operation, as mutually agreed upon by the Company and the Selling Member, and (ii) with respect to the Class C Interests held by a Selling Member, the fair market value of such Class C Interests shall be determined based upon the going concern value of the International Operation, as mutually agreed upon by the Company and the Selling Member. If the parties do not agree upon a value within 90 days of an event causing a Dissociation, then the Company shall engage a qualified independent appraiser mutually acceptable to the Selling Member and the Class A Member to determine the fair market value of the Membership Interests of the Selling Member.

(2) "**Forfeiture Value**" means with respect to the Membership Interests held by a Selling Member, the lower of the Agreed Value or the amount of the Capital Account relating to such Membership Interests.

(d) The Company will give to the Selling Member written notice of the date on which the closing of the purchase will occur. At the closing, the Selling Member will execute and deliver to the purchaser such assignments and other instruments as will reasonably be requested by the purchaser to effect the transfer of the Selling Member's Membership Interest, free and clear of all liens, claims and encumbrances (other than this Agreement). Unless otherwise agreed upon by the Company and the Selling Member, the Company will pay the purchase price to the Selling Member as follows:

(1) An amount equal to twenty five percent (25%) of the purchase price will be paid to the Selling Member on the Closing Date in cash.

(2) The balance of the purchase price will be evidenced by a promissory note, dated as of the Closing Date, from the purchaser to the Selling Member providing for principal to be payable in five annual equal installments, commencing the first anniversary of the Closing Date, and for accrued interest to be payable on each principal installment date. The interest rate payable on the unpaid balance of the promissory note will be adjusted annually on the anniversary of the Closing Date and for any given period will be an annual rate equal to three percent. Such promissory note will be secured by a security interest on the Interests acquired and will be due and payable in full upon any payment default of more than ten (10) days, the commencement of the liquidation of the Company, the sale or other disposition of all or substantially all of the Company's assets, or any cessation of the Business. The purchaser will have the right to prepay the promissory note, in whole or in part, from time to time, without penalty.

X.8 **Right of First Refusal**. If at any time a Class B or Class C Member (the "**Offering Member**") desires to Transfer (except as otherwise permitted by this Article X) all or a portion of his, her or its Membership Interests (the "**Offered Interests**") to a third party purchaser, the Offering Member shall obtain from such third party a bona fide written offer to purchase the Offered Interest (a "**Third Party Offer**"). Upon receipt of a Third Party Offer, the following will apply:

(a) The Offering Member will give to the Company notice of his, her or its intention to sell all or a portion of his, her or its Membership Interests (the "**ROFR Notice**") pursuant to the Third Party Offer. The ROFO Notice shall attach a copy of the Third Party Offer and shall specify (i) the number of Offered Interests, (ii) the price per Membership Interest set forth in the third party offer, and (iii) the terms and conditions of such proposed purchase of the Offered Interest.

(b) The Company will have thirty (30) days from the receipt of the ROFR Notice to elect to purchase the Offered Interests at the price, terms and conditions as set forth in the Third Party Offer.

(c) If the Company does not elect to purchase all of the Offered Interests within the time period set out above, the Offering Member will have the right to consummated the sale or conveyance of all of the Offered Interests pursuant to the Third Party Offer. If for any reason the Offering Member has not sold the Offered Interests within such 90 day period, the Offering Member shall not thereafter dispose of the Offered Interests unless and until the Offering Member has again complied with all of the provisions of this Section

## ARTICLE XI
## DISSOLUTION AND TERMINATION

XI.1 **Events Causing Dissolution**. The Company will be dissolved upon the first to occur of the following events:

(a) The approval of the Manager to dissolve;

(b) The sale of all or substantially all the Property; or

(c) Any other event causing a dissolution of the Company under the Act.

XI.2 **Effect of Dissolution**. Except as otherwise provided in this Agreement, upon the dissolution of the Company, the Manager and the Company will take such actions as may be required in accordance with the Act and will proceed to wind up, liquidate and terminate the business and affairs of the Company. In connection with such winding up, the Manager will have the authority to liquidate and reduce to cash (to the extent necessary or appropriate) the Property of the Company as promptly as is consistent with obtaining a fair and reasonable value for such assets, and after allocation of the Company's Profits or Losses in accordance with Section 2 of the Tax Exhibit, to apply and distribute the proceeds of such liquidation and any remaining assets in accordance with the order of priority set forth in Section 5.3, and to do any and all acts and things authorized by, and in accordance with, the Act and other applicable laws for the purpose of winding up and liquidation.

## ARTICLE XII
## MISCELLANEOUS

XII.1 **Title to Assets**. Title to the Property and all other assets acquired by the Company will be held in the name of the Company. No Member will individually have any ownership interest or rights in the Property or any other assets of the Company, except indirectly by virtue of such Member's ownership of a Membership Interest. No Member will have any right to seek or obtain a partition of the Property, including the Property, or other assets of the Company, nor will any Member have the right to any specific assets of the Company upon the liquidation of or any distribution from the Company.

XII.2 **Nature of Membership Interests in the Company**. A Member's Membership Interests will be personal property for all purposes; provided, however, for purposes of the Uniform Transfer on Death Security Registration Act or any similar applicable legislation and for purposes of granting and perfecting a security interest, Membership Interests in the Company will be and is a "security" as defined in and governed by Article 8 of the Uniform Commercial Code.

XII.3 **Notices**. Except for the notices required by Section 6.3, which will be governed by that section, any notice, demand, request, call, offer or other communication required or permitted to be given by this Agreement or by the Act will be sufficient if in writing and if hand delivered or sent by mail to the address of the Member as it appears on the records of the Company. All mailed notices will be deemed delivered when deposited in the United States mail, postage prepaid.

XII.4 **Waiver of Default**. No consent or waiver, express or implied, by the Company or a Member with respect to any breach or default by another Member hereunder will be deemed or construed to be a consent or waiver with respect to any other breach or default by such Member of the same provision or any other provision of this Agreement. Failure on the part of the Company or a Member to complain of any act or failure to act of another Member or to declare such other Member in default will not be deemed or constitute a waiver by the Company or the Member of any rights hereunder.

XII.5 **No Third Party Rights**. None of the provisions contained in this Agreement will be for the benefit of or enforceable by any third parties, including, without limitation, creditors of the Company.

XII.6 **Set-Off**. Without limiting any other right the Company may have, the Company, in its sole discretion, may set off against any amounts due a Member or Assignee from the Company any and all liquidated amounts then or thereafter owed to the Company by the Member or Assignee in any capacity, whether or not such amount or the obligations to pay such amount owed by the Member is then due.

XII.7 **Entire Agreement; Amendment**. This Agreement (together with the Articles,

agreement between the Members, in such capacity, and the Company relative to the operation and continuation of the Company. Except as otherwise expressly provided in Section 4.3 of this Agreement, this Agreement may not be amended, altered, modified or changed.

XII.8 **Severability**.  In the event any provision of this Agreement is held to be illegal, invalid or unenforceable to any extent, the legality, validity and enforceability of the remainder of this Agreement will not be affected thereby and will remain in full force and effect and will be enforced to the greatest extent permitted by law.

XII.9 **Binding Agreement**.  Subject to the restrictions on the disposition of Membership Interests herein contained, the provisions of this Agreement will be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, personal representatives, successors and permitted assigns.

XII.10 **Headings**.  The headings of the articles and sections of this Agreement are for convenience only and will not be considered in construing or interpreting any of the terms or provisions hereof.

XII.11 **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original and all of which will constitute one agreement that binds all of the parties hereto.  This Agreement may be delivered by facsimile transmission or by scanned e-mail transmission.  This Agreement will be considered to have been executed by a person if there exists a photocopy, pdf, facsimile copy, or a photocopy of a facsimile or pdf copy of an original hereof or of a counterpart hereof which has been signed by such person. Any photocopy, pdf, facsimile copy, or photocopy of facsimile or pdf copy of this Agreement or a counterpart hereof will be admissible into evidence in any proceeding as though the same were an original.

XII.12 **Governing Law and Agreement Supersedes Act**.  This Agreement will be governed by and construed in accordance with the laws of Illinois applicable to agreements executed and to be wholly performed within Illinois. The provisions of this Agreement will supersede and control over any and all provisions of the Act to the contrary, to the maximum extent permitted by the Act.

XII.13 **Dispute Resolution**.  To the extent feasible, the parties desire to resolve any controversies or claims arising out of or relating to this Agreement through discussions and negotiations between each other.  All parties agree to attempt to resolve any disputes, controversies or claims arising out of or relating to this Agreement by face-to-face negotiation with the other party.  Any dispute arising under the terms of this Agreement that cannot be resolved by the Members shall be resolved by mediation or binding arbitration in accordance with the rules of the American Arbitration Association ("**AAA**") applying the substantive law of the state of Illinois, without regard to any conflict of law provisions. The arbitration shall be held at the AAA offices in Chicago, Illinois.  The arbitration shall be governed by the rules of civil procedure for actions filed in Illinois superior courts as set forth in the Illinois Code of Civil Procedure, and the parties shall have all rights and powers afforded to a civil litigant in the Superior Court, including the ability to conduct full discovery. The arbitrator(s) shall award the applicable party who prevails in such arbitration their reasonable legal fees, court costs, accounting fees, expert fees, and any other reasonable direct out-of-pocket expenses associated with such dispute.

XII.14 **Further Assurances**.  Each of the parties to this Agreement shall execute and deliver any and all additional papers, documents and other assurances, and shall do any and all acts and things reasonably necessary in connection with the performance of their obligations under this Agreement to carry out the intent of the parties to this Agreement.

XII.15 **WAIVER OF JURY TRIAL.  THE COMPANY, EACH MANAGER AND THE MEMBERS HEREBY KNOWINGLY, IRREVOCABLY, UNCONDITIONALLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHTS EACH MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, PROCEEDING, COUNTERCLAIM OR DEFENSE BASED ON THIS AGREEMENT, OR ARISING OUT OF, UNDER OR IN ANY WAY CONNECTED TO THIS AGREEMENT OR THE COMPANY, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO RELATING TO THE COMPANY OR THIS AGREEMENT.**

XII.16 **Agreement Drafted by Counsel to Company**.  Each Member acknowledges that (i) Polsinelli PC has prepared the Articles and this Agreement on behalf of and in its capacity as counsel for the Company and (ii) each other Member has been advised by such law

*[Remainder of page left blank intentionally.]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of January 1, 2019.

**THE COMPANY:**                     **THE MEMBERS:**

Griffin Asset Management, LLC      Michael E Griffin

By                                   _____ 10/31/19
Michael E. Griffin

                                   Simon Clark

                                   _____ 10/31/19.

_____
_____

_____
_____

## SCHEDULE A

### LIST OF MEMBERS
### (1/1/19)

| Member | Capital Account | Class A Membership Interests | Class B Membership Interests | Class C Membership Interests | Percentage Interest of All Membership |
|---|---|---|---|---|---|
| Michael Griffin | $100,000 | 100,000 | | | 75.46% |
| Simon Clark * | $0.00 | | 5,377 | 25,000 | 22.92% |
| James Gallagher* | $0.00 | | 2,150 | | 1.62% |
| TOTAL | $100,000 | 100,000 | 7,527 | 25,000 | 100.00% |

The deemed value of the Company as of January 1, 2019, is $100,000.

\* The Membership Interests are subject to vesting as provided for in each Member's respective Interest Award Agreement. Each such person is allowed to transfer all of the equity in the Company to a wholly-owned entity and to transfer their interest, in whole or in part, to family members in connection with each person's estate planning plans.

60600643.12